# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the<br>person by name and address)*<br><br>**The person of Andrew NEMETH** | ) <br> ) <br> ) Case No. 8:24-mj-00177-DUTY <br> ) <br> ) <br> ) <br> ) <br> ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 15 U.S.C. §§ 78j(b) 78ff | Insider Trading |

The application is based on these facts:

See attached Affidavit

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Caroline Agan

*Applicant's signature*

Caroline Agan, Special Agent (FBI)

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____

*Judge's signature*

City and state:   Santa Ana, California

Autumn D. Spaeth, U.S. Magistrate Judge

*Printed name and title*

AUSA: Melissa Rabbani (714-338-3499)

## AFFIDAVIT

I, Caroline Agan, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been employed since June of 2022. I am currently assigned to the Los Angeles Field Office, Orange County Resident Agency's complex financial crimes squad and my duties include the investigation of wire fraud, mail fraud, and securities fraud matters. In 2022, I attended and completed the FBI's Basic Field Training Course in Quantico, Virginia and have received specialized training related to investigating white-collar crime. Throughout my work and training, I have learned of the FBI's criminal investigative and arrest authority, as well as investigative techniques for conducting criminal investigations.

2.    During my employment with FBI, I have initiated and assisted with investigations involving financial crimes. I have participated in numerous warrants to seize evidence of violations of federal and state law, as well as apprehended individuals who have violated these laws.

### II. PURPOSE OF AFFIDAVIT

3.    This affidavit is submitted in support of an application for a warrant to search the person of Andrew NEMETH, as described in Attachment A, and seize the items described in Attachment B, including certain electronic devices used by NEMETH (the "SUBJECT DEVICES"), which are the evidence, fruits,

and instrumentalities of violations of Title 15, United States
Code, Sections 78j(b) 78ff, and Title 17, Code of Federal
Regulations, Section 240.10b-5 (Insider Trading) (the "SUBJECT
OFFENSE").

4.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.

5.   This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only, and all dates and times
are on or about those indicated.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

6.   The FBI is currently investigating a possible insider
trading ring that traded in the securities of Activision
Blizzard, Inc. shortly before the announcement of Microsoft
Corporation's intention to purchase Activision.  The
investigation has revealed that three individuals together made
over $2.7 million dollars in net profits by placing aggressive
options trades in Activision days before the announcement.

7.   In connection with this investigation, on April 10,
2024, the Honorable Karen E. Scott, United States Magistrate
Judge for the Central District of California, issued a search
warrant for Andrew NEMETH's residence in Laguna Beach,

California, authorizing agents to search the premises and seize evidence, fruits, and instrumentalities of violations of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Insider Trading) (the "SUBJECT OFFENSE").  That search warrant, and the accompanying affidavit in support of the search warrant, is attached hereto as **Exhibit 1** and incorporated into this affidavit by reference.

8.    On Thursday, April 18, 2024, I learned that NEMETH had left the country.  An employee of United States Customs and Border Patrol advised the FBI that NEMETH is scheduled to return to the United States on April 21, 2024, on United Airlines Flight 33 from Tokyo to Los Angeles.

9.    The FBI intends to intercept NEMETH when he returns to the United States.  Thus, this application seeks a warrant to search NEMETH's person for evidence, fruits, and instrumentalities of the SUBJECT OFFENSE, including NEMETH's personal cellular phone.

## IV. CONCLUSION

10.   For the reasons described above, and set forth in **Exhibit 1**, there is probable cause to believe that the items

//

//

//

//

//

listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES will be found at on the person of Andrew NEMETH, as described in Attachment A.

            /s/ Caroline Agan
            Caroline Agan, Special Agent
            Federal Bureau of
            Investigation

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
April, 2024.

_____
HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE

## <u>ATTACHMENT A</u>

<u>PREMISES TO BE SEARCHED</u>

The person of Andrew NEMETH.

**ATTACHMENT B**

ITEMS TO BE SEIZED

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 15, United States Code, Sections 78j(b) 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Insider Trading) (the "SUBJECT OFFENSE"), namely:

a.    Information relating to Microsoft Corporation, Activision Blizzard, Inc., or any other companies where inside information appears to have been communicated;

b.    Information relating to interest in and/or awareness and knowledge of insider trading laws and regulations by An Le and Andrew Nemeth;

c.    Information relating to any advice and/or instructions concerning the purchase or sale of securities, including between and among, An Le and Andrew Nemeth;

d.    Communications, or information reflecting communications showing the identity and relationship of, and communications between and among coconspirators, including An Le and Andrew Nemeth, and individuals associated with Microsoft Corporation and/or Activision Blizzard;

e.    Content relating to the distribution of any proceeds or payments related to securities trading between An Le and Andrew Nemeth;

f.    Communications or information indicating any fabrication of a story between and among An Le and Andrew Nemeth regarding the source of inside information;

i

g.   Records relating to gym visits or gym memberships of Andrew Nemeth.

h.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof, including any cellular phone(s) used by Andrew Nemeth, including the cellular phone with assigned number (310) 409-3728.

2.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

b.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the attachment of other devices;

d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.   evidence of the times the device was used;

f.   applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to

run software contained on the device, or to conduct a forensic examination of the device;

        g.  records of or information about Internet Protocol addresses used by the device.

    3.  As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

    4.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## SEARCH PROCEDURE FOR DIGITAL DEVICES

5.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.  The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress Andrew Nemeth's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Andrew Nemeth's face with his or her eyes open to activate the facial-, iris-, or retina-recognition

feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means          ☐ Original     ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| **826 Cliff Drive, Upper Unit,** | ) |
| **Laguna Beach, California 92651** | )  Case No. 8:24-MJ-00163-DUTY |
| | ) |
| | ) |
| | ) |
| | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

    An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

    *See Attachment A*

    I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

    *See Attachment B*

    Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

    **YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*
☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

    Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

    The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

    ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

    ☐ for ____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   <u>10 April 2024 at 9:23 AM Pacific</u>

                                              *Karen E. Scott*
                                             *Judge's signature*

City and state:   <u>Santa Ana, California</u>          <u>Hon. Karen E. Scott, U.S. Magistrate Judge</u>
                                                    *Printed name and title*

AUSA:   <u>M. Rabbani</u>

## EXHIBIT 1

AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means (Page 2)

(Page 2)

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
|  |  |  |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## <u>AFFIDAVIT</u>

I, Kathleen Moran, being duly sworn, declare and state as follows:

## I.   <u>INTRODUCTION</u>

1.   I am a Special Agent of the Federal Bureau of Investigation ("FBI") currently assigned to the white-collar crime squad in the Seattle Field Division.  I have been employed as a Special Agent of the FBI since May 2005.  I have received basic federal law enforcement training, including the training at the FBI Academy, as well as other specialized federal law enforcement training.  I have investigated violations of federal statutes governing various types of white-collar crime, including wire fraud, mail fraud, bank fraud, securities fraud, money laundering, and theft of government and public money.

## II. <u>PURPOSE OF AFFIDAVIT</u>

2.   This affidavit is submitted in support of an application for a warrant to search the premises located at 826 Cliff Drive, Upper Unit, Laguna Beach, California 92651 ("the SUBJECT PREMISES"), as described in Attachment A, and seize the items described in Attachment B, including certain electronic devices used by Andrew Nemeth (the "SUBJECT DEVICES"), which are the evidence, fruits, and instrumentalities of violations of Title 15, United States Code, Sections 78j(b) 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Insider Trading) (the "SUBJECT OFFENSE").

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from various law enforcement personnel and witnesses, including, but not limited to: (a) evidence obtained as a result of prior search warrants issued in this case, as detailed below; (b) business records and other documents obtained from various entities; (c) information provided to me by the SEC; and (d) publicly available documents.

4.     This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

## III.  <u>SUMMARY OF PROBABLE CAUSE</u>

5.     The FBI is currently investigating a possible insider trading ring that traded in the securities of Activision Blizzard, Inc. shortly before the announcement of Microsoft Corporation's intention to purchase Activision.  The investigation has revealed that Tam Thi Nhu Pham, An Tu Le, and Nhan Chan Le together made over $2.7 million dollars in net profits by placing aggressive options trades in Activision days before the announcement.

6.     On Friday, January 14, 2022, Tam Pham, An Le, and Nhan Le each purchased Activision securities in their separate brokerage accounts near the end of the trading day. This activity was outside of their normal trading patterns.  The

weekend following January 14, 2022, was a holiday weekend and the market was closed on Monday, January 17, 2022.  On Tuesday, January 18, 2022, Microsoft and Activision announced the merger before the trading market opened. When the market opened, Activision's stock opened at a much higher price, and Tam Pham, An Le and Nhan Le sold their Activision securities and realized enormous returns.

7.    The United States District Court for the Western District of Washington has authorized two prior search warrants during the course of this investigation.  On January 24, 2023, U.S. Magistrate Judge Michelle Peterson, Western District of Washington, authorized the first warrant to search for and seize retained communications and other records associated with Apple accounts used by Tam Pham, An Le, and Nhan Le (the "Apple Search Warrant").  On February 1, 2023, U.S. Magistrate Judge Mary Alice Theiler, Western District of Washington, authorized a second search warrant to search for and seize retained communications and other records associated with Google accounts used by An Le and Nhan Le (the "Google Search Warrant").

8.    The SUBJECT DEVICE(S) belongs to Andrew Nemeth.  An Le's attorney represented to the government that, at some time prior to the public announcement, Andrew Nemeth overheard a conversation regarding the Microsoft-Activision merger at the gym, and he passed this information to An Le.  If this was true, then An Le's trading activity might not be unlawful. However, the investigation to date does not substantiate the attorney's explanation. Telephone records obtained for An Le and Andrew

Nemeth do not indicate any phone calls or text messages exchanged between the two during the time in question. Emails obtained as a result of the Google search warrant do not show any emails exchanged between An Le and Andrew Nemeth during the time in question. In addition, iMessages obtained as a result of the Apple search warrant do not show any messages exchanged between An Le and Andrew Nemeth during the time in question. However, iMessages sent at other times by An Le indicate that An Le and Andrew Nemeth communicated via WhatsApp, Telegram, and Signal. There is probable cause to believe, therefore, that the SUBJECT DEVICE(S) contains evidence regarding the inside information and the source of that information, or in the alternative, contains evidence that An Le and Andrew Nemeth did not communicate during the trading period, but instead later fabricated a story regarding the source of the inside information.

9. In addition to the FBI's criminal investigation, the U.S. Securities and Exchange Commission's (SEC) Division of Enforcement is conducting a parallel civil regulatory investigation into this possible insider trading ring.

## IV. **RELEVANT LEGAL PROVISIONS**

10. Title 15, United States Code, Section 78ff provides: "Any person who willfully violates any provision of this chapter ... or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter ... shall upon conviction be fined not

more than $5,000,000, or imprisoned not more than 20 years, or both."

11.  Title 15, United States Code, Section 78j(b) provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

12.  Section 78j(b) expressly incorporates the SEC's regulations into the criminal statute.  Specifically, Rule 10b-5 provides in relevant part: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

13.  In general, the courts have interpreted these securities fraud provisions to require the proof of the following elements in the context of "insider trading" cases:

- First, that the defendant traded the securities as alleged;

- Second, at the time she traded the securities, she was in possession of material, non-public information as alleged;

- Third, the defendant was an insider of the issuer, owed a fiduciary duty or other duty to the issuer, or was aware that the information was misappropriated by an insider;

- Fourth, the defendant acted knowingly, willfully and with the intent to defraud in connection with the sale; and

- Fifth, the defendant used the means or instrumentalities of interstate commerce, or the mails or the facilities of a national securities exchange in connection with the trade.

See United States v. O'Hagan, 521 U.S. 642 (1997); Dirks v. SEC, 463 U.S. 646 (1983); SEC v. Yun, 327 F.3d 1263 (11th Cir. 2003); SEC v. Sargent, 229 F.3d 68 (1st Cir. 2003); United States v. Smith, 155 F.3d 1051 (9th Cir. 1998).

14.  Consistent with case law, the SEC has further interpreted its rule to prohibit the sale or purchase of securities "on the basis of material, non-public information

misappropriated in the breach of a duty of trust or confidence."
17 C.F.R. § 240.10b5-2.

15.  As discussed in more detail below, Tam Pham, An Le,
and Nhan Le engaged in trading in the securities of Activision,
and the trades were made on the basis of material, non-public
information. Based upon the types of securities purchased,
including the strike price and expiration date, the actions
taken to execute the trades (moving money to trade, trading in
the last 30 minutes of trading, enlisting others to trade),
there is probable cause to believe that the trades were made
knowing the information was misappropriated by an insider.

**V.  <u>STATEMENT OF PROBABLE CAUSE</u>**

**A.  Relevant Individuals and Entities.**

16.  **Tam Thi Nhu Pham:** Tam Pham, a resident of Bellevue,
Washington, is the Chief Financial Officer of American Dream
Home Group, LLC, a Washington State real estate development and
investment company.  On or about March 9, 2020, Tam Pham opened
in her name E*Trade brokerage account *7732.  In her application
to E*Trade, Tam Pham stated that she was self-employed and her
employer was TP Home LLC.  Tam Pham told FBI Agents that An Le
is a good friend and business partner.

17.  **An Tu Le:**  An Le, a resident of Ladera Ranch,
California, is the owner of An Le Corporation, which appears to
buy and sell luxury purses and beauty products.  According to
Washington State Secretary of State online records, An Le is
also a Governor of American Dream Home Group LLC.  On or about
November 4, 2017, An Le opened in her name Robinhood Financial

brokerage account *5298.  In her application to Robinhood, An Le stated that she was self-employed.

18.  **Nhan Chan Le:**  Nhan Le, a resident of Fountain Valley, California, has been employed by Amazon.com, Inc. as a data scientist since approximately August 2022.  Prior to his employment with Amazon, Nhan Le was employed by Osprey Data, Inc. as a data scientist.  Nhan Le is An Le's brother.  On or about August 2, 2018, Nhan Le opened in his name Robinhood Financial brokerage account *6094.

19.  **Andrew Nemeth:** Andrew Nemeth, a resident of Laguna Beach, California, appears to be self-employed as a buyer and seller of luxury purses and accessories.  Financial transactions and iMessages exchanged between An Le and Andrew Nemeth indicate they have a business relationship involving the purchase and sale of luxury purses and accessories.  For example, on September 29, 2022, Andrew Nemeth messaged An Le, "$1,012,000. Can we sell it?? Frank passed so it's available.  And it's a Kelly – not a Birkin".  An Le responded, "It's so beautiful. I really don't know" "If we can sell it" …"We can stock it, but I need time to move 1 mil to pay for it" "But again, how much should we ask for it".  Andrew Nemeth responded, "Totally! Maybe we ask $1.5?  But it needs to be sold on the Super DL I think".  Financial transactions between An Le and Andrew Nemeth indicate An Le wired a total of approximately $5,205,500 to Andrew Nemeth between July 2021 and December 2022, while Andrew Nemeth wired An Le a total of approximately $454,694 during the same time frame.  An Le and Andrew Nemeth also appear to be good

friends.  For example, on September 29, 2022, An Le messaged
Andrew Nemeth, "Love ya! Say hi to everyone in the fam for me"
and Nemeth replied, "L♥VE YOU!!!!!".

20.  **Activision/Microsoft:**  Activision Blizzard, Inc.
("Activision") is a publicly traded company that provides
interactive gaming and entertainment experiences.  Activision is
headquartered in Santa Monica, California.  Activision's stock
is publicly traded on the Nasdaq Stock Market under the ticker
symbol ATVI.  Microsoft Corporation is a publicly traded
technology company headquartered in Redmond, Washington.

21.  According to a February 18, 2022, filing by Activision
with the U.S. Securities and Exchange Commission ("SEC"),
Microsoft initially approached Activision about discussing
strategic opportunities between the two companies on November
19, 2021.  On November 26, 2021, Microsoft informed Activision
that it was preliminarily considering making an all-cash
acquisition proposal for Activision at $80 per share.  The two
companies continued to negotiate, and Activision explored
interest by other companies, until January 17, 2022.  Early on
the morning of Tuesday, January 18, 2022, Activision and
Microsoft executed the merger agreement at $95 per share and,
prior to the opening of trading markets that day, issued a joint
press release announcing the execution of the merger agreement.

22.  The announcement of the merger appeared to come as a
surprise to the market.  First, a review of publicly available
information did not reveal any acquisition rumors concerning
Activision.  Second, the price of Activision stock did not

increase substantially between the end of November 2021, when it was trading at around $60 per share, and the time of the announcement on January 18, 2022, when it was trading at around $65 per share.  Finally, in late December 2021 and early January 2022, shortly before the merger announcement, several analysts expressed concern about Activision's stock price by either lowering their price targets or downgrading their ratings on Activision stock.

**B.    Trading Activity.**

23.  I have reviewed the trading records, money transfer records, and IP records belonging to the brokerage accounts for Tam Pham (E*Trade account *7732), An Le (Robinhood account *5298) and Nhan Le (Robinhood account *6094).  I have also reviewed the T-Mobile phone records for the phone numbers belonging to Tam Pham, An Le, and Nhan Le.  The investigation has revealed that Tam Pham, An Le, and Nhan Le purchased many options contracts on Activision stock late in the trading day on Friday, January 14, 2022, the last trading day before Microsoft and Activision announced the merger on January 18, 2022.[1]  As discussed below, Tam Pham, An Le, and Nhan Le had telephonic contact on January 13th and 14th, prior to their purchase of Activision options.  An Le also had telephonic contact on January 13th with a good friend of hers, S.L.  S.L.'s husband is a partner at an accounting firm that worked on the Microsoft-

---

[1] Monday, January 17, 2022, was Martin Luther King, Jr. Day, a federal holiday.  Thus, the trading markets were closed that day.

Activision deal, and individuals at the firm with knowledge of the deal worked closely with S.L.'s husband.

24.   On Thursday, January 13, 2022, S.L. called An Le at approximately 11:13 a.m. PST and they spoke for 43 minutes. Later that same day, at approximately 1:54 p.m. PST, Tam Pham called An Le and they spoke for approximately 30 minutes. According to records provided by T-Mobile, prior to this call, An Le and Tam Pham last had telephonic contact approximately one month earlier – on December 15, 2021.  At 9:32 p.m. PST, An Le called Nhan Le and they spoke for approximately one hour. Robinhood Financial provided IP address information related to Nhan Le's brokerage account that indicated Nhan Le took some action in his account during the phone call with An Le.[2] Finally, at 11:08 p.m. PST on January 13, 2022, Tam Pham logged into her E*Trade brokerage account.

25.   On Friday, January 14, 2022, Tam Pham called An Le at 11:49 a.m. PST, although it does not appear they spoke.  An Le returned Tam Pham's phone call at 11:53 a.m. PST, and they spoke for approximately six minutes.  At 12:04 p.m. PST, Robinhood captured IP address information related to An Le's brokerage account, indicating that An Le took some action in her account. The last time Robinhood captured IP address information for An Le's account was in May 2021.  At 12:09 p.m. PST, Robinhood captured IP address information for Nhan Le's account.  An Le

---

[2] According to Robinhood, customers generally remained logged into Robinhood and IP address information is captured by events generated by user actions within the iOS/Android mobile app and/or web platform.

called Nhan Le at 12:23 p.m. PST and the call lasted approximately eleven minutes.

26.   At some point on January 14, 2022, An Le and Nhan Le each transferred $14,000 from their individual bank accounts to their individual brokerage accounts.  According to trading records provided by Robinhood, during the phone call between An Le and Nhan Le at 12:23 p.m. PST (which occurred 37 minutes before the trading markets closed) [3], Nhan Le began purchasing Activision (ATVI) call options.  Nhan Le used the $14,000 he deposited into his brokerage account to partially fund the purchase of 500 ATVI call options expiring on January 21, 2022, with a strike price of $70; 500 ATVI call options expiring January 21, 2022, with a strike price of $71; and 400 ATVI call options expiring January 28, 2022, with a strike price of $72. In the midst of his purchases of ATVI call options, Nhan Le sold Palantir shares at a loss in order to free up cash to purchase additional ATVI call options.  Nhan Le spent a total of $28,392 purchasing ATVI call options.

27.   At 12:33 p.m. PST on January 14, 2022, An Le used the $14,000 she deposited into her Robinhood account that same day to fund the purchase of 275 ATVI call options expiring on January 21, 2022, with a strike price of $71, for a total cost of $4,125.  This trading was out of the ordinary for An Le. Prior to this purchase, An Le last bought or sold any securities in her account in February 2021.

--------

[3] Trading markets generally close at 4 p.m. ET or 1 p.m. PT.

28.   At 12:43 p.m. PST on January 14, 2022, An Le called Tam Pham again and they spoke for approximately sixteen minutes. According to records provided by E*Trade, at 12:45 p.m. PST, during the call with An Le, Tam Pham logged into her brokerage account.  At 12:57 p.m. PST, a few minutes before the close of the market on January 14, 2022, Tam Pham bought 700 ATVI call options expiring on January 28, 2022, with a strike price of $71, for a total cost of $32,984.  This trading was out of the ordinary for Tam Pham.  Prior to this purchase, Tam Pham generally opened option positions of ten contracts or less, and the last time she traded options was in April 2021.  The ATVI options purchase made up one-third of the value of Tam Pham's E*Trade account.

29.   A call option is an instrument that provides the holder the right to purchase 100 shares of stock for each call, at a particular strike price, up until the expiration date.  For example, Tam Pham's purchase of 700 ATVI call options gave her the right to purchase 70,000 common shares of Activision at the price of $71 per share at any time up until January 28, 2022.  A person purchases a call when he or she believes that the stock price will rise above the strike price before the expiration date.  That is because the call option will expire worthless, and the premium paid to purchase the call will be lost in its entirety, if the stock does not rise above the strike price before the expiration date.  In addition, the risk of loss is greater when the option is "out of the money," meaning the

strike price is above the current market price, or the option has a short expiration date.

30.   Taking the example of Tam Pham's purchase, on January 14, 2022, Activision stock closed at a market price of approximately $65 per share.  The strike price chosen by Tam Pham for her option purchase that same day was $71 per share, making the options Tam Pham purchased "out of the money."  This meant that if Activision stock did not rise above $71 by the expiration date of January 28, 2022, (two weeks later), Tam Pham would lose the entirety of the premium she paid to purchase the option.  Activision stock had last traded above $70 at the beginning of November 2021. On the other hand, if the underlying stock price of Activision increased and then even exceeded the strike price, before expiration, then the call option is considered "in the money" and the value of the option greatly increases from when the holder initially bought it.  At this point, the holder of the option has two choices to reap profits: one, to sell the call option outright in the derivatives market and receive a greater premium than she had initially paid; or two, "exercise" the option by purchasing the underlying stock, in this case Activision, at the strike price and then sell the stock at the higher market price.

31.   Activision's stock closed at a price of $65 on Friday, January 14, 2022.  The weekend following January 14, 2022 was a holiday weekend and the market was closed on January 17, 2022.  On January 18, 2022, after Microsoft and Activision announced the merger, Activision's stock opened at a price of $86.77.

14

32.   On January 18, 2022, An Le deposited $50,000 from her personal bank account into her Robinhood account.  An Le had wired the $50,000 from her business bank account to her personal bank account on January 14, 2022.  Based upon my review of her brokerage records, An Le did not purchase any securities with the $50,000.  Thus, I believe this was a failed attempt by An Le to transfer the $50,000 into her brokerage account in time to buy additional ATVI options prior to the announcement by Microsoft and Activision.

33.   At 4:56 a.m. PST on Tuesday, January 18, 2022, Robinhood captured IP address information for Nhan Le's account. The announcement by Microsoft and Activision occurred at 5:25 a.m. PST.  At 5:55 a.m. PST, shortly before the markets opened at 9 a.m. EST/ 6 a.m. PST, Nhan Le called An Le, although it does not appear they spoke.  At 5:56 a.m. PST, Robinhood captured IP address information for An Le's account.  According to records provided by Robinhood, Nhan Le sold all of his ATVI options between 8:19 a.m. PST and 8:20 a.m. PST, and realized a profit of approximately $1,661,096, a 5,850% return on his $28,392 investment.  Also at 8:20 a.m. PST, An Le called Nhan Le, however, it does not appear that they spoke.

34.   At 8:30 a.m. PST on January 18, 2022, Tam Pham called An Le and they spoke for approximately five minutes.  Tam Pham also logged into her E*Trade account at 8:30 a.m. PST.  At 8:38 a.m., An Le called Nhan Le and the call lasted for approximately nine minutes.  An Le then called Tam Pham at 8:54 a.m. PST, and the call lasted approximately 30 seconds.  At 8:57 a.m. PST, Tam

Pham placed an order to sell all her ATVI options, realizing a profit of approximately $809,739, a 2,455% return on her $32,984 investment. An Le sold her ATVI options between 9:10 a.m. PST and 9:26 a.m. PST, and realized a profit of approximately $308,698, a 7,483% return on her $4,125 investment.

35. Between January 19, 2022, and February 1, 2022, Tam Pham transferred a total of $800,000 in profits from the Activision options trades from her E*Trade account to a bank account in her name. On February 7, 2022, Tam Pham wired $776,723 to a bank account belonging to An Le.

**C. Apple and Google Search Warrants.**

36. According to information obtained as a result of the Google Search Warrant, An Le began insider-trading related Google searches on February 19, 2022. In March 2022, An Le conducted some of the following searches: "self-reported insider trading," "insider trading sec defense lawyer", and "can lawyer turn you in after consultation." Beginning in May 2022, Nhan Le conducted some of the following Google searches: "it was simply a bet Microsoft", "sec microsoft activision", and "sec matter under inquiry length."

37. Messages obtained as a result of the Apple Search Warrant revealed that Tam Pham purchased the ATVI options in her E*Trade account at An Le's request. The messages also indicate Tam Pham gave the ATVI profits to An Le, while An Le gave Tam Pham $33,000 "for shopping." Additional messages revealed that An Le paid the taxes owed by Tam Pham on the ATVI gains.

**D.   Overt Investigation.**

38.   On October 2, 2023, I interviewed Tam Pham regarding
her Activision options trading, and she confirmed much of what
was discovered from the Apple Search Warrant.  Tam Pham stated
that An Le called her minutes before the market closed on
January 14, 2022.  An Le requested that Tam Pham purchase ATVI
options in Pham's account.  An Le told Tam Pham that she had
bought ATVI options in her own account, but she did not have
enough time to transfer funds to buy more.  On January 18, 2022,
An Le instructed Tam Pham to sell the ATVI options.  Upon
learning about the Microsoft-Activision deal after the public
announcement, Tam Pham asked An Le how she knew about it and An
Le said she studied and did research.  Tam Pham confirmed that
she gave the majority of the profits from her ATVI trading to An
Le, and An Le paid the taxes on the gain.

39.   FBI Agents attempted to interview An Le and Nhan Le at
the same time Tam Pham was interviewed.  Nhan Le declined to
speak to FBI Agents without a lawyer present, and An Le was not
in the United States.  S.L. was also interviewed a few days
later and she denied knowing anything about her husband's work.

40.   Following the interview attempts, a criminal defense
attorney contacted the assigned Assistant United States
Attorney. An Le's lawyer later told the AUSA that the conduct in
question did not constitute insider trading because his client
learned the information from a person who was not an insider.
The attorney explained that a friend of An Le's named "Andy"
learned of the merger while at the gym. According to the lawyer,

17

"Andy" heard another gym member telling her personal trainer that her husband had been very busy because he was working on a merger between Microsoft and Activision.  The attorney initially would not provide "Andy's" last name, but referred the AUSA to "Andy's" attorney so that "Andy's" attorney could arrange an interview with "Andy." However, "Andy's" attorney would not agree to allow "Andy" to be interviewed, and did not provide "Andy's" last name. When the AUSA followed up with An Le's attorney, he revealed that "Andy's" last name was "Nemeth." No further information has been provided by An Le's or Andrew Nemeth's attorneys.

41.  In an attempt to verify An Le's attorney's information, I have reviewed telephone records for An Le and Andrew Nemeth and there are no phone calls or text messages exchanged between them on January 13 or January 14, 2022. Emails obtained as a result of the Google search warrant do not show any emails exchanged between An Le and Andrew Nemeth during this time.  iMessages obtained as a result of the Apple search warrant do not show any messages exchanged between An Le and Andrew Nemeth on January 13 or January 14, 2022, nor was there any indication from the iMessages that they were meeting in person on these days.

**E.   Relevance of the Subject Devices.**

42.  I have obtained telephone subscriber records from Verizon for cellular telephone number (310) 409-3728, believed to be used by Andrew Nemeth.  According to the subscriber record, as of January 26, 2024, the cellular telephone

associated with that number is subscribed to Andrew Nemeth, and has been so subscribed since January 13, 2013.  In addition, iMessages exchanged between An Le and (310) 409-3728 revealed that this cellular telephone number is used by Andrew Nemeth.

43.  If it is true Andrew Nemeth communicated the Microsoft-Activision inside information to An Le, I believe those communications may be found on Andrew Nemeth's cell phone. It is clear from the iMessages that An Le and Andrew Nemeth mainly communicated through WhatsApp.  For example, on September 8, 2020, An Le messaged Andrew Nemeth, "I sent texts on your WhatsApp" "It seemed like it did not go through.  Are you alright?".  On September 29, 2022, An Le sent Andrew Nemeth the following iMessage, "Morning brother!  I got a new iPhone so my WhatsApp is going through backup.  Would you mind texting me through iMessage for the time being."  Later that day, An Le let Nemeth know that her WhatsApp was working again and messaged, "Let's text on WhatsApp" and "I don't feel safe about iMessage."

44.  The Apple Search Warrant for An Le's iCloud account did not provide the contents of WhatsApp or other encrypted communication services, like Telegram or Signal, which An Le and Andrew Nemeth also used.  On June 14, 2021, group iMessages were exchanged between An Le, Andrew Nemeth, and a third individual where they discussed using a secure communication service. Nemeth messaged An Le and the third individual, "I have WhatsApp and Signal, but I don't think Telegram".  An Le responded, "Oh! Right, sorry I thought Andy and I were on telegram.  But we were on signal!".  An Le added, "I have Telegram!  Andy can just

19

download the app", and Nemeth responded, "I just downloaded". Given that the Microsoft-Activision information does not appear to have been shared by Andrew Nemeth through iMessage, a phone call, an email, or in person, the communications, if they exist, were likely made over WhatsApp, Signal, or Telegram, which can only be obtained from the cellular phone itself.  Based upon my experience and training, and the experience and training of other agents with whom I have communicated, messages exchanged on WhatsApp, Signal, or Telegram may be retained or stored on a cell phone for an indeterminate length of time, and may be transferred or restored from backup to new cellular phones.

45.    Based on the above, there is probable cause to believe that information contained on the SUBJECT DEVICE(S) could reveal, among other things: (1) context regarding the source and timing of the inside information, (2) the plans and strategies by An Le to trade on the inside information, (3) whether Andrew Nemeth shared the inside information with anyone other than An Le; and (4) whether An Le and Andrew Nemeth communicated about fabricating the narrative that Andy learned the information at the gym.

46.  Furthermore, there is reason to doubt An Le's explanation for the source of the information.  It is clear that An Le obtained very specific inside information.  To explain the trading behavior, An Le would have had to know the date the merger would be announced and the acquisition price for the shares. It seems highly unlikely that the alleged exchange between the gym member and her trainer would have included this

20

information. An Le and Nhan Le took action to move funds from their bank accounts to their brokerage accounts in order to buy ATVI options.  The options that Tam Pham, An Le, and Nhan Le purchased were aggressive in nature – the options expired in one to two weeks and the options were "out of the money".  An Le also instructed her friend, Tam Pham, to use her own money to purchase the options on An Le's behalf.  These show a level of confidence inconsistent with having learned the information third-hand at a gym.  Further, An Le's and Nhan Le's Google searches also show a level of concern that appears excessive if they, in fact, indirectly received the information.  The SUBJECT DEVICE(S), therefore, might contain communications between An Le and Andrew Nemeth about a fabricated story to explain the source of the inside information.

47.  There is probable cause to believe that digital devices were instrumentalities of the crimes in this case.  The inside information regarding the Microsoft-Activision deal was most likely shared using the SUBJECT DEVICE(S).  Alternatively, the SUJBECT DEVICE(S) contains evidence that An Le and Andrew Nemeth did not communicate during the trading period, but instead fabricated a story regarding the source of the inside information.

**F.   The Subject Premises.**

48.  I know that Andrew Nemeth resides at 826 Cliff Drive, Upper Unit, Laguna Beach, California 92651 because of the following: On February 26, 2024, United States Postal Inspector (USPI) Justin Lothyan learned from a United States Postal

Service supervisor at the appropriate delivery office that
Nemeth was currently receiving mail at this address.  On March
22, 2024, an FBI Agent conducting surveillance observed a male
individual matching Nemeth's description through a window of the
SUBJECT PREMISES.  The male individual exited the SUBJECT
PREMISES and remained outside the SUBJECT PREMISES for several
minutes.  I have reviewed photographs taken by the FBI Agent of
the male individual and compared them to known photographs of
Andrew Nemeth, and I believe the male individual observed at the
SUBJECT PREMISES was Andrew Nemeth.

49.  I believe that the SUBJECT DEVICE(S) belonging to
Andrew Nemeth will be found at the SUBJECT PREMISES.  Cellular
telephones are often found with their owners so that they may be
accessed at any time. While the owners are at home, these
devices are likely with them at the residences.  Because the FBI
intends to search the SUBJECT PREMISES while Nemeth is present,
there is probable cause to believe that the SUBJECT DEVICE(S)
will be found at the residence.

## VI.   **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

50.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained

22

in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

2.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

3.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Nemeth's thumb and/or fingers on the

device(s); and (2) hold the device(s) in front of Nemeth's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

51.   As noted above, investigators have obtained evidence through search warrants to Apple and Google, however, the potential communications containing inside information are believed to have occurred over WhatsApp, Telegram, or Signal, which cannot be obtained with a search warrant.   The investigation is no longer covert, however, investigators have not approached Andrew Nemeth or An Le directly for this evidence.   I believe, based upon the nature of the investigation and the information I have received, that if Andrew Nemeth becomes aware of investigators' interest in the SUBJECT DEVICE(S) in advance of the execution of a search warrant, he may attempt to destroy any potential evidence, thereby hindering law enforcement agents from the furtherance of the criminal investigation.

## VII.  <u>CONCLUSION</u>

52.   For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations

//

//

//

//

//

of the SUBJECT OFFENSES will be found at the SUBJECT PREMISES,

as described in Attachment A.


/s/ Kathleen Moran
_____
Kathleen Moran, Special Agent
Federal Bureau of
Investigation


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 10th day of
April, 2024.


_____
HONORABLE KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE

27

## **ATTACHMENT A**

PREMISES TO BE SEARCHED

The premises located at 826 Cliff Drive, Upper Unit, Laguna Beach, California 92651, further described as the upper level of a beige two-story residence with the numbers "826" affixed to a balcony post, and pictured below:



## ATTACHMENT B

ITEMS TO BE SEIZED

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 15, United States Code, Sections 78j(b) 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Insider Trading) (the "SUBJECT OFFENSE"), namely:

a.    Information relating to Microsoft Corporation, Activision Blizzard, Inc., or any other companies where inside information appears to have been communicated;

b.    Information relating to interest in and/or awareness and knowledge of insider trading laws and regulations by An Le and Andrew Nemeth;

c.    Information relating to any advice and/or instructions concerning the purchase or sale of securities, including between and among, An Le and Andrew Nemeth;

d.    Communications, or information reflecting communications showing the identity and relationship of, and communications between and among coconspirators, including An Le and Andrew Nemeth, and individuals associated with Microsoft Corporation and/or Activision Blizzard;

e.    Content relating to the distribution of any proceeds or payments related to securities trading between An Le and Andrew Nemeth;

f.    Communications or information indicating any fabrication of a story between and among An Le and Andrew Nemeth regarding the source of inside information;

g.    Records relating to gym visits or gym memberships of Andrew Nemeth.

h.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof, including any cellular phone(s) used by Andrew Nemeth, including the cellular phone with assigned number (310) 409-3728.

2.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the attachment of other devices;

d.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.    evidence of the times the device was used;

f.    applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to

ii

run software contained on the device, or to conduct a forensic examination of the device;

        g.  records of or information about Internet Protocol addresses used by the device.

    3.  As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

    4.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## SEARCH PROCEDURE FOR DIGITAL DEVICES

5.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress Andrew Nemeth's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Andrew Nemeth's face with his or her eyes open to activate the facial-, iris-, or retina-recognition

feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.